Filed 12/19/22  In re A.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | D080214 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  J.W.,  Defendant and Appellant. | (Super. Ct. No. EJ4568A) |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis, III, Judge.  Conditionally reversed and remanded with directions.

Brent Riggs, under appointment by the Court of Appeal for Defendant and Appellant.

Claudia Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Eliza Molk, Deputy County Counsel for Plaintiff and Respondent.

Monica Vogelmann, Counsel for Minor.

J.W. (Mother) appeals from a Welfare and Institutions Code section 366.26[1] order terminating her parental rights to her daughter, A.W. Mother contends: (1) the juvenile court abused its discretion by denying her request for a continuance of the contested section 366.26 hearing; (2) the court erred by finding the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply to preclude the termination of her parental rights; and (3) the San Diego County Health and Human Services Agency (the Agency) and the court did not comply with their initial duties to inquire regarding A.W.'s possible Indian ancestry under section 224.2, subdivisions (b) and (c), which implement in part the federal Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).

As explained below, we conclude the court did not err by denying Mother's request for a continuance or by finding the beneficial parent-child relationship exception did not apply to preclude the termination of Mother's parental rights. However, we conclude that the Agency and the court erred by not complying with their initial duties of inquiry under section 224.2 and that those errors were prejudicial under the standard of prejudice set forth in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*), which we recently adopted in *In re Y.M.* (2022) 82 Cal.App.5th 901 (*Y.M.*). Accordingly, we conditionally reverse the section 366.26 order and remand for the limited purpose of compliance with section 224.2 and ICWA.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In October 2020, the Agency filed a section 300, subdivision (b)(1) dependency petition for then two-year-old A.W., alleging that she was at substantial risk of serious physical harm because of substance abuse by Mother and her father, R.Q. (Father), was incarcerated and unable to protect her. The Agency's field worksheet noted that A.W.'s tribal affiliation was "Blackfeet."

In its detention report, the Agency stated that Mother was nine months pregnant and admitted that she used methamphetamine daily with her boyfriend, G.O., in a hotel living room adjacent to the bedroom where she left A.W. alone. Mother denied any Indian heritage. Mother identified J.B. as her father, who lived in San Diego, and D.B. as her mother, who lived in South Carolina. She also identified C.F. as A.W.'s paternal aunt, who lived in Santee and occasionally cared for A.W. during Mother's prior incarcerations. Mother also had a one-year-old child, I.L., who was in the care of her father, E.C., and with whom she did not have contact. Because Father's whereabouts was then unknown to the Agency, it could not inquire of him regarding any Indian ancestry.

At the detention hearing, Mother was present by video and her counsel denied Mother had any known Indian ancestry. The juvenile court found that the Agency had made a prima facie case in support of its petition and detained A.W. in out-of-home care.

---

[2] For additional factual and procedural background, refer to our opinion in Mother's previous appeal in *In re A.W.* (Apr. 13, 2022, as modified Apr. 21, 2022, D079417 [nonpub. opn.]) (hereinafter *A.W. I*).

In its jurisdiction and disposition report, the Agency stated that A.W. was detained in the home of C.F., her paternal aunt, who was willing to adopt her. A paternal aunt (presumably C.F.) denied that the paternal family had any Indian ancestry. Mother told the Agency that she believed J.B. was unaware of Mother's existence at the time of her birth. She had just recently reconnected with him and he allowed her to reside in his home. Her adult half-brother and adult half-sister also resided there. The Agency spoke with the maternal grandfather, J.B., who confirmed that he would allow Mother to continue living in his home. Mother stated that she did not have a relationship with, or speak to, any of her six siblings, whom she identified for the Agency. She stated she had been in foster care as a child because the maternal grandmother was addicted to drugs and often incarcerated.

At the November jurisdiction and disposition hearing, Mother and Father appeared by telephone. Father's counsel denied that Father had any Indian ancestry. The court found that ICWA did not apply to A.W.'s case. The court then granted Father's request for a continuance of the contested jurisdiction and disposition hearing. Also in November, Mother gave birth to J.O., who was subsequently removed from her care.

At the continued jurisdiction and disposition hearing in December, the court made a true finding on the petition's allegations, declared A.W. a dependent of the court, placed her in relative care, and ordered reunification services for the parents.

In its six-month review report, the Agency stated that Mother had discontinued her participation in a remote drug treatment program, had not entered an inpatient drug treatment program, and had struggled with housing. Mother had weekly supervised visits with A.W., but was habitually late. In May 2021, Mother was arrested and charged with transporting or

4

selling methamphetamine and possession for sale of methamphetamine. She was also alleged to have committed those offenses while out on bail or release, possessing a firearm without being its registered owner, and carrying a loaded firearm in public. Mother had not regularly communicated with the Agency and had not shown substantial progress in her case plan. Nevertheless, the Agency recommended that the court continue reunification services for Mother and Father for an additional six months.

At the initial six-month review hearing in June, A.W.'s counsel requested a contested hearing on the issue of termination of Mother's reunification services, noting Mother's recent arrest and lack of participation in drug abuse treatment. At the contested six-month review hearing in late July, the juvenile court terminated Mother's reunification services finding that there was no substantial probability A.W. could be returned to her care within 12 months, but it continued services for Father. On Mother's appeal, we affirmed that order in *A.W. I*.

In its 12-month review report submitted in late September, the Agency recommended that the court terminate Father's reunification services and set a section 366.26 hearing to select a permanent plan for A.W. After Father had been released from incarceration in late June, he had not been in contact with the Agency and had not had any in-person visits with A.W. Mother had not visited with A.W. since early August. At the contested 12-month review hearing in October, the court terminated Father's reunification services and set a section 366.26 hearing to select a permanent plan for A.W.

In its section 366.26 report submitted in January 2022, the Agency recommended that the court terminate Mother's and Father's parental rights and select a permanent plan of adoption for A.W. The Agency reported that Mother had been incarcerated since early December for assault with force,

5

robbery, possession of a controlled substance while armed, and possession of a controlled substance for sale. Her projected release date was in early June 2022. A.W.'s relative caregivers had cared for her since October 2020 and had consistently met A.W.'s physical, developmental, and emotional needs. They wanted to adopt her. They also cared for J.O., A.W.'s half-sister, who was also a dependent of the juvenile court. A.W. referred to her caregivers as "Mommy" and "Daddy." The Agency opined that A.W.'s relationship with Mother did not rise to the level of a parent-child relationship. Mother had not maintained consistent visitation with A.W. due to her multiple incarcerations, which interfered with her ability to strengthen and develop a quality relationship with A.W. The Agency opined that Mother had not been able to place her children's needs ahead of her own needs, as shown by her continued substance use and criminal activity. The Agency believed that it would not be detrimental to A.W. if Mother's parental rights were terminated. It believed that adoption would provide A.W. with permanency and stability.

In its addendum report submitted in March, the Agency stated that Mother had not called A.W. since early February. It continued to recommend termination of parental rights and selection of a permanent plan of adoption for A.W.

On March 23, 2022, the juvenile court conducted the contested section 366.26 hearing. At the outset, the court denied Mother's request to continue the hearing. The court admitted in evidence the Agency's reports and the report of A.W.'s CASA liaison. It also heard the testimony of Mother and an Agency social worker. The court found without prejudice that ICWA did not apply to A.W.'s case. The court found that A.W. was likely to be adopted if parental rights were terminated and that none of the circumstances in

6

section 366.26, subdivision (c)(1) applied to preclude the termination of parental rights. The court then terminated the parental rights of Mother and Father, selected a permanent plan of adoption for A.W., and set a postpermanency planning hearing. Mother timely filed a notice of appeal challenging the March 23, 2022 order.

## DISCUSSION

## I

### *Denial of Continuance of Section 366.26 Hearing*

Mother contends the juvenile court abused its discretion by denying her request for a continuance of the contested section 366.26 hearing.

## A

Mother and her counsel appeared in person at the contested section 366.26 hearing on March 23, 2022. At the outset, Mother's counsel requested a continuance of the hearing, stating that Mother was currently in local custody and that she expected to be released to enter an inpatient drug treatment program on or about April 15. Her counsel argued that event would constitute a change of circumstance which would allow her to file a section 388 motion. Accordingly, her counsel requested a continuance of at least two weeks to allow Mother to complete her intake into, and get settled in, the program. Her counsel also noted that Mother was still receiving services regarding her other child and therefore it would not be in A.W.'s and Mother's interests to proceed with the section 366.26 hearing at that time.

A.W.'s counsel objected to the continuance request, arguing that the orders from Mother's criminal case showed she was not eligible for release into a drug abuse treatment program until June 2, if one were available. Likewise, the Agency's counsel objected to the continuance request, arguing that to the extent the request was an oral section 388 motion, it should be

7

denied because even if a continuance were granted Mother would show, at most, changing circumstances.

The juvenile court initially expressed its concern that Mother's multiple incarcerations had created a lack of consistent contact between A.W. and Mother and had jeopardized their relationship. The court found that Mother's circumstances were, at best, changing and that she had not shown any ability to be consistent with her contact with A.W. Because A.W. was then four years old, the court stated it was time to seriously focus on providing her with stability and permanency. It stated that Mother's claim of changed circumstances would be more appropriately addressed in a section 388 motion at a subsequent time. The court denied Mother's request for a continuance of the hearing, but nevertheless encouraged her to go into the drug treatment program and show an ability to have consistent contact with A.W. It commented that Mother had some work to do and stated: "The door is never closed until the court says it's closed. The door is open, but you've got to do a lot of work."

After considering the evidence and closing arguments at the contested section 366.26 hearing, the court terminated Mother's and Father's parental rights and selected a permanent plan of adoption for A.W. The court noted that Mother could later enter a drug treatment program and then come back to the court. The Agency's counsel interjected, stating that Mother could not file a section 388 motion after her parental rights had been terminated for A.W. Mother's counsel then noted that Mother had another child and therefore she needed to enter the drug treatment program. The Agency's counsel agreed. The court responded, stating: "Okay. So you do need to do those things so that you can have that opportunity [presumably to reunite with her other child, J.O.]. And you're right, I mixed two hearings together."

8

## B

Continuances of hearings are generally discouraged in dependency cases. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604; *Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242.) They may be granted "only upon a showing of good cause" and provided that a continuance would not be "contrary to the interest of the minor." 3(§ 52, subd. (a)(1), (2).) In considering a continuance request, the court shall "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Id.* at subd. (a)(1).)

On appeal, we review the juvenile court's ruling on a request for a continuance for abuse of discretion. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481.) An abuse of discretion occurs when a court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination, which exceeds the bounds of reason under the circumstances. (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456.) The appellant bears the burden on appeal to show the juvenile court abused its discretion by denying a request for a continuance. (*In re Angela R.* (1989) 212 Cal.App.3d 257, 266–267.) Finally, we may reverse an erroneous order denying a continuance request only if it resulted in a miscarriage of justice. (*Ibid.*; *In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.)

## C

Based on our review of the record, we cannot conclude that the juvenile court abused its discretion by denying Mother's request for a continuance of the section 366.26 hearing. In particular, the court could reasonably find that a continuance would not be in A.W.'s best interest because it would delay the permanency and stability that the selection of a permanent plan

9

would provide her. By the time of the hearing on March 23, 2022, A.W., then four years old, had been in dependency proceedings and in out-of-home care for over 18 months. Contrary to Mother's assertion, the fact that A.W. was placed with the same caregiver as her half-sister, J.O., and that Mother was still receiving reunification services in J.O.'s dependency case did not compel the court to exercise its discretion by granting her request for a continuance of the section 366.26 hearing. Because Mother's reunification services had previously been terminated, the court could reasonably conclude that A.W. deserved a timely section 366.26 hearing that could provide her with stability and permanency.

Also, as the Agency argues, the court could have reasonably found that Mother and/or her counsel had not provided persuasive evidence showing that she would, in fact, be released to an inpatient drug treatment program on or about April 15 or at any other time before her expected June 2 release from custody. Although her counsel represented, and Mother later testified, that she would be released early into an inpatient drug treatment program, the court could have found that testimony and argument unpersuasive, and perhaps speculative, especially since her admission to the inpatient drug treatment program was apparently contingent on space availability.[3] Based on the evidence and arguments of Mother's counsel, we conclude that the juvenile court did not abuse its discretion by finding that Mother had not shown good cause to continue the section 366.26 hearing and by denying her request for a continuance.

_____

[3] Mother testified that her projected release date was June 2, but that she had spoken with an inpatient program (i.e., Family Recovery Center) that would be "picking [her] up on April 15th."

10

Contrary to Mother's assertion, it does not appear that the juvenile court's finding that Mother had not shown good cause for a continuance was based on its apparent misunderstanding that Mother could nevertheless subsequently file a section 388 motion after she entered the drug treatment program. As the Agency notes, at the section 366.26 hearing the court subsequently acknowledged its confusion of A.W.'s case with J.O.'s dependency case. The court recognized that because Mother was still receiving reunification services in J.O.'s case, she could file a section 388 motion in that case. (Cf. *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780 [juvenile court did not abuse its discretion by denying continuance of siblings' § 366.26 hearing despite hypothetical possibility of child being placed with other siblings in Texas].) Despite acknowledging that initial confusion, the court here did not reconsider or otherwise change its finding that Mother had not shown good cause for a continuance. Contrary to Mother's assertion, the record does not affirmatively show that the juvenile court's decision to deny a continuance was based on an incorrect legal standard or an error of law regarding her ability, or inability, to file a section 388 motion in A.W.'s case. (Cf. *In re D.N.* (2020) 56 Cal.App.5th 741, 762; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1215; *In re A.S.* (2018) 28 Cal.App.5th 131, 144–145.) We therefore conclude that the record does not show the court would have found good cause for a continuance if it had initially understood that Mother could not file a section 388 petition after the termination of her parental rights at the section 366.26 hearing.

## D

Nevertheless, assuming arguendo the court erred by denying Mother's request for a continuance of the section 366.26 hearing, Mother has not carried her burden on appeal to show that error resulted in a miscarriage of justice that requires reversal of the section 366.26 order. (*In re Angela R.*, *supra*, 212 Cal.App.3d at pp. 266–267; *In re Gerald J.*, *supra*, 1 Cal.App.4th at p. 1187.) An error results in a miscarriage of justice within the meaning of the California Constitution when it is reasonably probable a result more favorable to the appellant would have occurred absent the error. (Cal. Const., art. VI, § 13; *In re Christopher L.* (2022) 12 Cal.5th 1063, 1073; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Mother wholly fails to argue, much less show, that the court's purported error in denying her continuance request was prejudicial. Specifically, Mother fails to show that had the juvenile court granted her request to continue the section 366.26 hearing until April 15 that: (1) she would have been (or was, in fact) released to an inpatient drug treatment program on or about April 15; (2) she would have thereafter filed a section 388 motion to modify a prior order (e.g., order terminating her reunification services); and (3) the juvenile court likely would have found she had shown changed circumstances that made it in A.W.'s best interest to reinstate Mother's reunification services. More importantly, Mother has not shown that it was likely she would have obtained a more favorable result at A.W.'s section 366.26 hearing even if the court had granted her request for a continuance. Accordingly, we conclude that any abuse of discretion by the juvenile court in denying Mother's request for a continuance was harmless error and does not require reversal of its section 366.26 order.

12

## II

### *Beneficial Parent-Child Relationship Exception*

Mother contends the juvenile court erred by finding that she did not carry her burden to show that the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) applied to preclude the termination of her parental rights.  In particular, she argues the court's factual findings were not supported by substantial evidence and its balancing of the detriment of termination of A.W.'s relationship with her against the benefits to A.W. of adoption was an abuse of discretion.

### A

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26."  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved."  (*Ibid.*)  The purpose of a section 366.26 hearing is to determine and implement the appropriate permanent plan for a dependent child.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  The juvenile court can choose among three permanent plans: adoption, legal guardianship, and long-term foster care.  (§ 366.26, subd. (b).)  When a child is adoptable, adoption is the preferred permanent plan unless there are countervailing circumstances or adoption is not in the child's best interest.  (*In re Heather B.* (1992) 9 Cal.App.4th 535, 546; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

At a section 366.26 hearing, it is the parent's burden to show an exception to termination of parental rights.  (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)  One

exception is when the juvenile court finds "a compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The California Supreme Court has clarified that the "compelling reason" language does not impose on the parent any burden beyond the requirement to show termination of the beneficial relationship would be "detrimental" to the child. (*Caden C., supra*, 11 Cal.5th at p. 635.)

*Caden C.* stated that under section 366.26, subdivision (c)(1)(B)(i), a parent has the burden to show, by a preponderance of the evidence, three prongs: (1) "regular visitation and contact with the child;" (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship;" and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) Specifically, in making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Because interaction between a child and his or her parent will generally confer some incidental benefit to the child, the parent must prove the child will benefit to such a degree as to overcome the preference for adoption. (*Ibid*.) The

14

beneficial parent-child relationship exception is not established simply by a showing of a parent's frequent and loving contact and relationship with their child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) Some of the factors the juvenile court should consider when determining whether the parent-child relationship is important and beneficial are: (1) the age of the child; (2) the portion of the child's life spent in the parent's custody; (3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs. (*Caden C.*, at p. 632; *Autumn H.*, at p. 576.)

On appeal, we apply a hybrid standard in reviewing a juvenile court's determination whether the beneficial parent-child relationship exception applies. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–641; *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530–531.) We apply the substantial evidence standard of review to the factual issues of maintenance of regular contact and visitation and the existence of a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination of that relationship would be detrimental to the child. (*Caden C.*, at pp. 639–641; *In re J.C.*, at pp. 530–531.) Under the substantial evidence standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's order and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*Caden C.*, at p. 640; *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298 (*S.B.*).) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C.*, at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*).)

B

At the section 366.26 hearing on March 23, 2022, the juvenile court heard the testimony of Mother and a social worker and admitted in evidence the Agency's reports, including those in which its social worker described her observations of A.W.'s visits with Mother and her opinions whether A.W. had significant relationships with Mother and Father and whether termination of those relationships would be detrimental to her when balanced against the benefits to her of adoption. The court found that Mother had not carried her burden on any of the three prongs of the beneficial parent-child relationship exception. In particular, the court stated that Mother's incarcerations "ha[d] prevented her from being consistently in the life of [A.W.]. It has prevented [Mother] from developing that nature of a relationship where you're more than just a very familiar and pleasant friend or person who visits. [A.W.] may conceptually know you as her mother based on the evidence that's been presented, based on the way you interact with her. She also knows and expresses that the caregivers are mommy and daddy, and that becomes more concrete because they're providing for the day-to-day care, and they have been providing, and she is thriving under that relationship. [¶] . . . What you contribute is positive, but that relationship isn't so strong and encompassing that it would make the termination of that relationship detrimental to [A.W.], because she would still look to the caregivers that are presently people she wakes up with every day as their primary support figure . . . ." The court concluded: "So the court finds by clear and convincing evidence that the circumstances listed under [section] 366.26 that would make it—termination of parental rights detrimental don't exist in this case . . . ."

16

C

First, Mother argues that there is evidence showing that she maintained regular visitation and contact with A.W. within the meaning of the first prong. She notes that at the July 2021 six-month review hearing, A.W.'s counsel conceded that Mother had been visiting A.W. and the Agency recommended continuation of her reunification services until the 12-month review hearing. She further notes that at the section 366.26 hearing, the Agency social worker confirmed that Mother had called A.W. during her incarceration when she was able to do so. Based on that evidence, Mother asserts the evidence showed she maintained regular visitation and contact with A.W. as section 366.26, subdivision (c)(1)(B)(i) requires.

However, by so arguing, Mother misconstrues and/or misapplies the substantial evidence standard of review. Under that standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's factual finding and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*Caden C.*, *supra*, 11 Cal.5th at p. 640; *S.B.*, *supra*, 164 Cal.App.4th at pp. 297–298.) Therefore, Mother cannot satisfy her burden on appeal by simply arguing there is substantial evidence that would have supported a contrary finding by the court (i.e., that Mother maintained consistent visitation and contact with A.W.). (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230 (*Dakota H.*).)

Here, the court found that Mother had not consistently been in A.W.'s life, thereby implicitly finding she had not satisfied the first prong of the beneficial parent-child relationship exception. Based on our review of the record, we conclude substantial evidence supports that finding by the court. As the Agency notes, the record shows that Mother was often late to visits

with A.W. during the reunification period and had missed six scheduled visits, leading to the termination of the third party's supervision of her visits with A.W.  Mother did not have any visits with A.W. from early August 2021 through mid-September 2021 and also, because of her incarceration, from early December 2021 through late March 2022.  During that latter time period, Mother infrequently called A.W. or her caregiver.  Finally, the Agency social worker testified that Mother's contact and visitation with A.W. was inconsistent because of her recurrent incarcerations.  Accordingly, we conclude Mother has not carried her burden on appeal to show substantial evidence does not support the court's finding that she did not show she had maintained consistent visitation and contact with A.W.

Second, Mother argues that substantial evidence does not support the court's finding that she did not carry her burden under the second prong to show that A.W. had a beneficial relationship with her.  Again, she cites evidence that would have supported a contrary finding by the court.  In particular, she cites evidence that she cared for A.W. from birth through age two and one-half years old, which naturally created a bond between them, and therefore she was more than just a familiar and pleasant friend or person to A.W.  Furthermore, although, as the court noted, A.W. referred to her current caregivers as mommy and daddy, Mother argues A.W. nevertheless had a beneficial relationship with her.  She argues that the court correctly noted that she contributed positively to A.W., but then erred in finding that she did not have a beneficial relationship with A.W. such that A.W. would suffer detriment if that relationship were terminated.  She also argues that because the court implied that A.W. might be returned to her care if a subsequent section 388 petition were granted, it must have believed

18

that A.W. had a beneficial relationship with her.[4]  Therefore, Mother argues that there is substantial evidence to support a finding that A.W. had a substantial positive emotional attachment to her within the meaning of the second prong.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 636.)

However, by so arguing, Mother again misconstrues and/or misapplies the substantial evidence standard of review.  As discussed above, Mother cannot satisfy her burden on appeal by simply arguing there is substantial evidence that would have supported a contrary finding by the court (i.e., that A.W. had a substantial positive emotional attachment to Mother within the meaning of the second prong).  (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 230.)

Here, the court presumably considered A.W.'s age at the time of the section 366.26 hearing (then four years old), the portion of her life that she had spent in Mother's custody (two years and nine months), the positive or negative impact to A.W. of interaction with Mother, and A.W.'s particular needs, along with all of the other evidence in the record, and found that A.W. did not have a substantial positive emotional attachment to Mother within the meaning of the second prong.  (See, *Caden C.*, *supra*, 11 Cal.5th at p. 632; *Autumn H.*, *supra,* 27 Cal.App.4th at p. 576.)  Based on our review of the record, substantial evidence supports the court's finding.  In its section 366.26 report, the Agency stated that Mother's inconsistent visitation with A.W. due to her multiple incarcerations had interfered with her ability to strengthen and develop a quality relationship with A.W.  At the section

---

4       However, as noted above, the court later corrected its confusion of A.W.'s case with J.O.'s case and agreed with the Agency's counsel that Mother would be unable to file a section 388 petition after denial of her request for a continuance and termination of her parental rights at the section 366.26 hearing.

366.26 hearing, the court noted that Mother had been absent for portions of A.W.'s life because of her recurrent incarcerations. Also, there is evidence showing that A.W. suffered symptoms of anxiety and demonstrated negative behaviors in 2021 after visits with Mother. The Agency social worker testified that A.W. was easily distracted during her phone calls with Mother. Finally, as the Agency notes, A.W. thrived in the care of her caregivers, progressing physically, mentally, and developmentally, despite Mother's absences. Based on that evidence and other evidence in the record, we conclude there is substantial evidence to support the court's finding that Mother did not show A.W. had such a beneficial relationship with her that it would be detrimental to A.W. to terminate that relationship. Mother has not carried her burden on appeal to show otherwise.

Third, Mother argues, in a conclusory manner, that the court abused its discretion by finding under the third prong that the benefits to A.W. of adoption outweighed the benefits to her of continuing her relationship with Mother. However, in so arguing, Mother has not carried her burden on appeal. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Rather, we conclude that the court could reasonably find that A.W. would not suffer any detriment from the termination of her relationship with Mother. A.W. was thriving in the care of her caregivers and was placed with J.O., with whom she had developed a close bond. Furthermore, in its section 366.26 report, the Agency opined that it would not be detrimental to A.W. if Mother's parental rights were terminated and that adoption would provide A.W. with permanency and stability. Based on this record, we conclude that the court could reasonably believe that the permanency and stability that adoption could provide to A.W. outweighed any detriment to her of the termination of her relationship with Mother. Accordingly, we conclude the court correctly found that the

20

beneficial parent-child relationship exception did not apply to preclude the termination of Mother's parental rights.[5]

## III

### *Section 224.2 Initial Inquiry Duties*

Mother contends the Agency and the juvenile court did not comply with their initial duties under section 224.2 to inquire regarding A.W.'s possible Indian ancestry and that their errors were prejudicial.

### A

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's

---

[5] In her appellant's reply brief, Mother argues for the first time that the court also erred by finding that the beneficial sibling relationship exception (i.e., § 366.26, subd. (c)(1)(B)(v)) applied to preclude the termination of her parental rights. However, by not raising that argument below in the juvenile court (much less carrying her burden of proof to show that exception applied) and by belatedly raising it in her appellant's reply brief, Mother has waived or forfeited that argument. (Cf. *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339 [appellate courts have held that parent's failure to raise issue in juvenile court prevents parent from presenting that issue on appeal]; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [issues not addressed in appellant's opening brief will be disregarded on appeal]; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18 ["appellant cannot salvage a forfeited argument by belatedly addressing the argument in its reply brief"].) Accordingly, we need not, and do not, address that argument.

tribe" of the pending proceedings and their right to intervene. (25 U.S.C. § 1912(a); see also, *Isaiah W.*, at p. 8.) California law also requires such notice. (§ 224.3, subd. (a) ["If the court [or] a social worker . . . knows or has reason to know . . . that an Indian child is involved, notice pursuant to [ICWA] shall be provided for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement . . . ."].) Both ICWA and California law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

Sections 224.2 and 224.3 set forth California's current ICWA inquiry and notice requirements for juvenile dependency cases. Under sections 224.2 and 224.3, the Agency and the juvenile court are generally obligated to: (1) conduct an initial inquiry regarding whether there is a reason to believe the child is, or may be, an Indian child; (2) if there is, then further inquire whether there is a reason to know the child is an Indian child; and (3) if there is, then provide ICWA notice to allow the Indian tribe to make a determination regarding the child's tribal membership. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1048–1052; *In re Austin J.* (2020) 47 Cal.App.5th 870, 882–885.)

Section 224.2, subdivision (a) imposes on the juvenile court and the Agency "*an affirmative and continuing duty to inquire* whether a child for whom a petition under Section 300 . . . has been filed, is or may be an Indian child[.]" (Italics added.) Section 224.2, subdivision (b) establishes the Agency's duty of initial inquiry, providing: "If a child is placed into the temporary custody of [the Agency] . . . , [the Agency] . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to,

22

asking the child, parents, legal guardian, Indian custodian, *extended family memb*ers, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (Italics added.) Section 224.2, subdivision (c) imposes on the juvenile court an independent duty of inquiry, providing: "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" and "the court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is a Indian child."

Section 224.2, subdivision (e) imposes a duty of further inquiry on the Agency and the juvenile court, providing:

> "If the court [or] social worker . . . has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is a reason to know that the child is an Indian child, the court [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."

Before the juvenile court can find that ICWA does not apply to a child's case, it must make a finding that "due diligence as required in this section [has] been conducted." (§ 224.2, subd. (i)(2).)

We review a juvenile court's findings that the Agency has made reasonable inquiries regarding a child's possible Indian ancestry under ICWA and that the Agency has complied with ICWA's notice requirements, or that no such notice is required, for substantial evidence. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)

23

Mother contends, and the Agency implicitly concedes, that the Agency's initial section 224.2 inquiry was deficient because it failed to ask A.W.'s extended family members about the possibility of her Indian ancestry. The Agency's duty to make an initial inquiry into A.W.'s possible Indian ancestry applies to "parents," which includes Mother and Father, and "extended family members," which include the child's paternal and maternal grandparents, aunts, and uncles. (§ 224.1, subd. (c) ["extended family member" is defined as provided in 25 U.S.C. § 1903; § 224.2, subd. (b) [duty of initial inquiry includes "asking . . . parents [and] extended family members"]; cf. 25 U.S.C. § 1903(2) [term "extended family member" includes child's grandparents, aunts, and uncles].) Although the record shows that the Agency inquired of Mother and Father regarding any Indian ancestry and they and/or their counsel represented they did not have any such ancestry, the record does not show that the Agency inquired of any of A.W.'s extended family members regarding possible Indian ancestry, except for a paternal aunt (presumably C.F.) who denied any Indian ancestry. Mother correctly notes that the Agency had an obligation to make a meaningful effort to locate and interview A.W.'s extended family members to obtain whatever information they may have as to her possible Indian status. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.)

Here, the record shows the Agency had contact with and/or names of and information regarding many of A.W.'s extended family members, including the maternal grandmother, the maternal grandfather, and A.W.'s aunt and uncle with whom Mother lived in the maternal grandfather's San Diego home. Mother informed the Agency that she had six siblings, but the record does not indicate that the Agency took any meaningful efforts to

24

identify and/or locate them, much less inquire of them about any Indian ancestry. The record also does not show that the Agency took any meaningful efforts to identify and/or locate A.W.'s paternal grandparents or paternal aunts or uncles (other than C.F.) or inquire of them about any Indian ancestry. Accordingly, as the record shows and the Agency concedes, the Agency did not inquire of any of those extended family members about any possible Indian ancestry. Based on those failures by the Agency, we conclude it did not comply with its duty of initial inquiry in this case. (Cf. *Y.M.*, *supra*, 82 Cal.App.5th at p. 909 [error in finding ICWA did not apply where agency had contact with paternal grandmother and paternal grandfather, but did not ask them about possible Indian ancestry]; *In re J.C.* (2022) 77 Cal.App.5th 70, 78–79 (*J.C.*) [error in finding ICWA did not apply where agency had regular contact with paternal grandmother and maternal grandmother was readily accessible, but it did not ask them about possible Indian ancestry]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 (*Darian R.*) [error in finding ICWA did not apply where agency had contact with maternal aunt and maternal grandfather, but it did not ask them about possible Indian ancestry].) Because substantial evidence does not support the juvenile court's implicit finding at the section 366.26 hearing that the Agency complied with its duty of initial inquiry under section 224.2, subdivision (b), we conclude the court erred by finding at that hearing that ICWA did not apply to A.W.'s case.

C

Mother also contends that the juvenile court did not comply with its initial duty of inquiry under section 224.2. As she correctly notes, the record does not indicate that the court directly inquired of Mother, Father, or C.F. about any possible Indian ancestry at their initial appearances at A.W.'s dependency hearings or at any of their subsequent appearances. By failing to

inquire of Mother, Father, and C.F., the court did not comply with its section 224.2, subdivision (c) duty of inquiry. Furthermore, as Mother argues, there is no indication in the record, and therefore substantial evidence does not support a finding, that the court complied with its duty to ascertain of the Agency about its due diligence efforts in inquiring about A.W.'s possible Indian ancestry. (§ 224.2, subd. (i)(2); cf. *J.C.*, *supra*, 77 Cal.App.5th at p. 70; *In re N.G.* (2018) 27 Cal.App.5th 474, 482.) Accordingly, based on the failures of the Agency and the juvenile court to comply with their respective duties of inquiry under section 224.2, we conclude the court erred by finding at the section 366.26 hearing that ICWA did not apply to A.W.'s case.

D

Mother argues that the Agency's and juvenile court's errors in failing to comply with their initial duties of inquiry under section 224.2 are prejudicial and require conditional reversal of the section 366.26 order and remand for compliance with section 224.2 and ICWA. We agree.

In *Y.M.*, *supra*, 82 Cal.App.5th 901, at pages 916 to 918, we adopted and applied the *Benjamin M.* standard for determining whether section 224.2 initial inquiry errors by the Agency and the juvenile court are prejudicial. Until such time that the California Supreme Court directs otherwise, we conclude the *Benjamin M.* standard should be applied in determining the prejudicial effect of section 224.2 inquiry errors by the Agency and the juvenile court.[6]

---

[6] We note that the California Supreme Court recently granted review in *In re Dezi C.* (2022) 79 Cal.App.5th 769 (review granted, Sep. 21, 2022, S275578) and in deciding that case presumably will resolve the current split of authority regarding the correct standard for appellate courts to apply in determining the prejudicial effect of section 224.2 inquiry errors.

26

In *Benjamin M.*, *supra*, 70 Cal.App.5th 735, the court adopted a new standard of prejudice to apply in ICWA inquiry error cases, stating:

> "[I]n ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but *where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child. . . .* In such cases, courts have generally avoided applying broad, rigid reversal rules and instead focused on *whether the missing information was readily obtainable and whether such information would have shed meaningful light on the inquiry that the agency had a duty to make.*" (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744, italics added.)

In the circumstances of that case, the father never appeared in the juvenile court and was never asked whether he had reason to believe the child was an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Furthermore, the agency had not asked extended family members, such as the father's brother and sister-in-law, whether the child had Indian ancestry. (*Ibid.*) *Benjamin M.* concluded that the missing information was both readily obtainable and would likely have shed meaningful light on the question of whether there was reason to believe the child was an Indian child and therefore conditionally reversed the order and remanded for ICWA compliance. (*Id.* at pp. 744, 746.) The *Benjamin M.* standard of prejudice "does not require 'proof of an actual outcome (that the parent may actually have Indian heritage).' [Citation.] The missing information need only be relevant to the ICWA inquiry, 'whatever the outcome will be.' " (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 679 (*Ricky R.*).)

Here, the record shows that information regarding possible Indian ancestry was readily available from the maternal grandfather, the maternal grandmother, and, presumably, the paternal aunt and paternal uncle with whom Mother lived in the paternal grandfather's San Diego home. The fact that Mother and Father denied Indian ancestry did not relieve the Agency or juvenile court of their duties of initial inquiry under section 224.2, including the Agency's duty to inquire of A.W.'s extended family members about possible Indian ancestry. A contrary rule would "ignore[] the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554.) Also, because Mother informed the Agency that she had six siblings, the names of and/or contact information for A.W.'s maternal aunts and uncles presumably were readily available to the Agency and therefore it could have contacted them to inquire as to any Indian ancestry. Finally, information from Father and/or C.F. (A.W.'s paternal aunt) regarding the names and contact information for A.W.'s other paternal extended family members (e.g., paternal grandmother, paternal grandfather, and other paternal aunts or uncles) presumably was readily available to the Agency and those extended family members could also have been contacted by the Agency to inquire as to any Indian ancestry.

If the only error here were the Agency's and the juvenile court's failures to inquire of C.F. and the maternal grandfather, we might have found the error harmless because C.F. sought to adopt A.W. and therefore had a strong incentive to raise any Indian ancestry (cf. *Y.M.*, *supra*, 82 Cal.App.5th at pp. 917–918; *In re S.S.* (2022) 75 Cal.App.5th 575, 582) and Mother was living with the maternal grandfather and therefore could have easily asked him about any possible Indian ancestry (cf. *Y.M.*, at p. 917; *Darian R.*, *supra*, 75 Cal.App.5th at p. 510). Nevertheless, there was readily available

information from A.W.'s *other* extended family members that was likely to bear meaningfully on the question of whether she was, or may be, an Indian child, regardless of the outcome of the inquiry. (Cf. *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744; *Ricky R.*, *supra*, 82 Cal.App.5th at p. 680.) Accordingly, we conclude the Agency's and the juvenile court's section 224.2 initial inquiry errors were prejudicial and require conditional reversal of the section 366.26 order and the court's finding that ICWA does not apply to A.W.'s case.

Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

## DISPOSITION

The section 366.26 order issued on March 23, 2022, terminating parental rights is conditionally reversed and the matter is remanded to the juvenile court with directions that, within 30 days of the remittitur, the Agency must file a report demonstrating its compliance with the initial inquiry provisions of section 224.2, subdivision (b), and, if required, conduct further inquiry under section 224.2, subdivision (e). Within 45 days of the remittitur, the juvenile court must conduct a hearing to determine whether the Agency's investigation satisfied its affirmative duty to investigate. The juvenile court has the discretion to adjust these time periods on a showing of good cause.

If after due inquiry neither the Agency nor the juvenile court has reason to believe or to know that A.W. is an Indian child, the March 23, 2022 order shall be reinstated by the juvenile court. Alternatively, if after completing the inquiry the Agency or the juvenile court has reason to believe

29

or to know A.W. is an Indian child, the juvenile court shall proceed accordingly in conformity with ICWA and related California law.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.

30